DAVID EISENBERG
**DAVID EISENBERG, P.L.C.**
3550 N. Central Avenue, Ste. 1155
Phoenix, Arizona 85012
Arizona State Bar No. 017218
Telephone: 602.237.5076
Email: david@deisenbergplc.com

Attorney for Defendant Anthony Michael Brock



UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | CR-22-00917-PHX-SPL |
|---|---|
| Plaintiff, | **DEFENDANT ANTHONY MICHAEL BROCK'S SENTENCING MEMORANDUM** |
| v. | |
| Anthony Michael Brock, | |
| Defendant. | **(Sentencing Set for August 29, 2023)** |

The Defendant Anthony Michael Brock, by and through undersigned counsel, respectfully submits his memorandum on sentencing in which he requests that the Court follow the recommendation proposed by the United States Probation Office (USPO) and sentence him to a three year term of probation. A probationary sentence would also be consistent with the government's position on sentencing, a recommended term of probation (Doc. 30 [Plea Agreement], ¶ 3b, p. 3). Moreover, such a sentence would fulfill the statutory sentencing factors in 18 U.S.C. §3553(a), including ones that reflect the seriousness of the offense, promote respect for the law and result in a just outcome.

## I. INTRODUCTION

Mr. Brock (hereafter Brock), a 26-year old, working man with no prior criminal history, was charged with one count of Dealing in Firearms Without a License, in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a) and 924(a)(1)(D), and eight counts of False Statements During the Purchase of a Firearm, in violation of 18 U.S.C. § 924(a)(1). The essence of Brock's conduct was his failure to use an up-to-date means of identification in filling out Form 4473, the Alcohol, Tobacco and Firearms (ATF) Firearms Transaction Record, when purchasing firearms. In using

a driver's license that no longer listed a current address when he filled out the form, Brock did not intend to hide his location in case law enforcement wanted to contact him about any of the purchases. Indeed, ATF readily located Brock through his mother, who told agents where he lived and gave them his current telephone number. When the agents called Mr. Brock, he readily agreed to meet, and he cooperated fully with them.

Brock was also charged with selling firearms without a license, which pertained to his history of buying a firearm, keeping it a while and then selling it when he needed money or simply grew tired of it. He sold firearms by advertising them on the internet in sites well known to firearms buyers.

These events are addressed further below, but at the outset it is important to note what this case is <u>not</u> about. None of the firearms the Defendant bought and resold have been traced to criminal activity, found at the scene of a crime or recovered by Mexican authorities, which is the not so uncommon result in cases involving straw purchases.

At its core, this is a case about a young man who simply failed to seriously heed the warnings on the ATF form about being accurate in giving the information requested and in the resale of firearms he purchased. He regrets his failure to follow the requirements for purchasing and reselling firearms, but he intended no harm.

## II.  THE SENTENCING FACTORS

### A.  Nature and Circumstances of the Offense

#### 1. Using Out-of-Date Identification

The Defendant, who was raised in Yuma, Arizona, lived there with his mother for several years on West 8th Street. This was the address Brock used when he obtained his Arizona driver's license, and it was correct at the time he got his license, which was issued by the Arizona MVD on July 5, 2018. In purchasing the firearms that are the subject of this case, Brock used this driver's license as identification. For the six pistols and one shotgun he bought between 2018 and 2020, the driver's license was accurate; he still lived in Yuma at the address on the license. (Doc. 31, ¶ 23.) However, by the time he bought the ten pistols from April 25, 2021 through

July 6, 2021 that are the subject of the indictment, he had moved to Tucson and lived there with his brother. Consequently, the address on the license for these purchases was not current and, therefore, not correct. (*Id.*, ¶ 24; Doc. 1 [the Indictment], Counts 2-9.)

Brock moved to Tucson for work in approximately September 2020, but he was not sure he would remain there. Part of his hesitation was that during this period of time COVID-19 adversely impacted the job market. So, in his written answers on Block 10 of the 4473s for his address, he listed the Yuma residence for these purchases, thinking that he might move back to his mother's house.

ATF opened an investigation on June 25, 2021 based on its review of firearms sales records for single and multiple purchases by Brock during the period of May 2018 through June 2021. ATF's check of APS records revealed that utilities for the address listed on the 4473s as taken from the driver's license were registered in the names of Jorge Macias and Jennifer Macias.

On July 21, 2021, ATF agents went to the address in Yuma listed on all the 4473 forms. Brock's mother, Jennifer Macias, was at home. She told the agents that her son had not resided there for the past six months but was living in Tucson at an address she did not know, although she knew how to get there. Mrs. Macias also told the agents that her son had been laid off from work, and her other son, Brock's brother, convinced Brock to move to Tucson where the brother lived. She also told the agents that her son was delivering Amazon packages in Tucson. Mrs. Macias offered to call her son, but the agents declined, stating that they would contact him themselves. She gave the agents her son's telephone number. Mrs. Macias also told the agents that Brock had obtained fingerprints for the ATF the day before and that he may have been trying to get a permit for some reason, but she was not entirely sure why. As Brock told the USPO during his pre-sentence interview, he was planning to get a license to sell firearms, which is probably what Mrs. Macias was referring to when she mentioned fingerprints at ATF.

After the agents left, Mrs. Macias called Brock about their visit. Brock immediately called the agents and arranged to meet with them. At the time of the call, Brock said he was in Yuma at a job fair.

3

About a week later, the agents met with Brock in Tucson at a Starbucks coffee shop. Brock told the agents in a recorded interview that he had been living in Tucson for the a "couple of months" trying to find work and that he was currently working for Amazon at $18 per hour; that he had worked for Vinyl Visions in Yuma but got laid off and that it was his brother who gave him the idea to move to Tucson. Brock gave the agents his address in Tucson.

Brock also told the agents that all the firearms he purchased were 9 mm pistols. He said he would acquire a firearm, use it for while, decide he no longer liked it and then acquire a new one and that he sold the firearms mainly through Armslist.com but also through Facebook and GunBroker.com. His identity clearly was on these websites, as he included his name when he listed his point of contact for potential purchasers. Brock admitted that he was "flipping" the firearms, making about $100 to $150 per sale, and that he was going to get an FFL license.

Brock told the agents that he liked firearms and liked to sell them, but would not do anything to jeopardize possessing them. The agents asked if he had identifying information disclosing who he sold his firearms to. Brock did not but said he did not know he needed to keep that information. He would never sell to anyone he thought was "shady." Brock gave the agents a name and telephone number of one of his buyers, who he believed lived in either Tucson or El Centro. The agents explained that El Centro is in California, not Arizona, and that he could not legally sell firearms to individuals who do not reside in Arizona. Brock said he did not know that.

With respect to using his mother's address in Yuma, the agents stated that negligence of the law did not preclude responsibility, Brock replied that he did not think he was doing anything wrong. When asked where the funds came from to buy the firearms, Brock responded "it's my money." There is no evidence that someone else was fronting the purchases.

In a bit of candor, one of the agents told Brock: "I know it's kind of petty at this point but you're putting down that you reside at this Yuma address, you don't. You're lying on the form. I know it's petty, I know it's your mom's house, I know you were there at one point but . . . Yeah but you know, there are reasons why these are in place and one is we ask that you put the address

4

that you reside at so that when we do have to come find you, talk to you or whatever, we know where that address is at; where you're at."

The agent also praised Brock for his honesty: "I'm going to be honest with you, but your cooperation and being forthcoming and all that, that goes a long way (indiscernible) I will tell you that."

## 2. Confiscation of a Firearm

At the end of the coffee shop interview, Brock voluntarily agreed to take the agents to his apartment to turn over the one firearm he still had in his possession, which he identified as an XTN Elite Springfield. The agents followed him to his home. At his apartment, Brock pointed out the firearm lying on his bed, and the agents seized it without any incident.

## B. History and Characteristics of the Defendant

The Defendant has no criminal history, and there are no pending charges.

The pretrial investigation report discloses his family circumstances. Throughout his life, Brock has had an excellent relationship with his mother, and as time went on, he became closer to his stepfather. Both know of this case and both have expressed their support for him. Both mention his acceptance of responsibility for what he did. In reviewing all of the character letters supplied to the Court, there is a common thread of comments about Brock's intelligence, effort to help others, kindness and determination to advance himself.

Brock graduated from high school in 2015, participating in varsity football, basketball and swimming. The presentence investigation report discloses his employment in several jobs. Unfortunately, the job Brock liked the most, as a ramp agent for an airlines company, disappeared when he was arrested in this case. He liked the position because it allowed him to travel and broaden his horizons. His present job as a concrete laborer is hard, physical, outdoor work.

Brock attends Pima Community College, where he is concentrating on cyber security courses so he can work in the cyber security field.

Brock tried to enlist in the Army, but due to asthma he was not accepted.

## C.   Sentencing Guideline Calculations

The Defendant agrees that the USPO has correctly calculated the total offense level, including base offense, specific offense characteristics and credit for acceptance of responsibility.  There are no adjustments for victim, role in the offense or obstruction of justice. At a total offense level of 13 and with a criminal history of zero resulting in Category of I, the guideline range is 12 to 18 months.

## D.   Kinds of Sentences Available

The defense also agrees with the USPO that there are no departures that fit this case. However,  the defense also agrees with the USPO's conclusion that a variance below the guideline low end is appropriate.  Specifically, the USPO provides:

> Of particular importance in this case is the history and characteristics of the defendant. Brock has no other criminal convictions, he lacks a history of violence, he does not abuse drugs or alcohol, and he has performed well while on pretrial release. A sentence within the range may be greater than necessary to deter him from further criminal conduct and protect the public." (Doc. 31, ¶ 91.)

Elsewhere in the PSR, the USPO also states:

> While his conduct does not appear to be malicious, and he was not purposefully allowing nefarious individuals to obtain firearms, such laws are put in place to limit the possibility of such people getting guns and using them in ways that hurt others and negatively impact communities.
>
> Brock has no other convictions, and he has no history of violence. It appears the instant offense was an outlier to his normal law-abiding nature and a severe lapse in judgment. . . .  He has no history of mental health or substance use issues, and he has the support of his mother and stepfather. Based upon these factors, he poses a low risk to the public and to reoffend. It is believed he has the ability to perform well while on probation or supervised release, and he can move forward from this event.
>
> Based upon Brock's aforementioned history and characteristics, a sentence within the guideline range appears greater than necessary to deter him from further criminal activity and to protect the public. Following a downward variance pursuant to 18 U.S.C. § 3553(a), a sentence of three years probation is respectfully recommended. . . . Also, should he choose to violate the terms of his probation, he could receive a sentence equivalent to the statutory maximum for this offense. (*Id.*, pp. 18-19.)

The USPO's recommendation of a term of probation is also based in part on the United States Pretrial Services records disclosing that Brock has been compliant with his release terms,

including reporting as instructed and staying employed full time, which shows that he will be a good candidate to comply with probationary terms.

**E.** **Respect for the Law, Just Punishment, Deterrence, Protection of the Public**

The USPO also addressed these characteristics. "It is believed such a sentence is not greater than necessary to promote respect for the law, protect the public, and hopefully provide adequate deterrence. A probation sentence is believed to be just punishment for this offense, as the conviction alone will prevent the defendant from ever being able to lawfully possess a firearm." The Defendant agrees with the USPO's assessment of these factors and incorporates them herein.

## III.  Conclusion

Brock respectfully submits that a three year term of probation is the appropriate outcome in this case.  It is a sufficient but not greater than necessary punishment for his conduct in this offense.  As he has shown at the change-of-plea hearing, during his interview with the USPO and as embedded in the character letters submitted on his behalf, he accepts responsibility for what he did, has no intention of repeating such conduct and looks to the future to become a productive member of society.

Respectfully submitted this 14th day of August, 2023.


*s/ David Eisenberg*

DAVID EISENBERG
Counsel for Defendant Anthony Michael Brock

I hereby certify that on August 14, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Addison Santome, Esq.
Assistant U. S. Attorney


*s/ David Eisenberg*
David Eisenberg